**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**CIANDRE DAVIS,**

                          **Plaintiff,**

      **v.**                                                 **9:16-CV-1474**

**NURSE PARKER; NURSE COLVIN;**
**NURSE HAYDEN; and NURSE**
**PRACTITIONER WILCOX,**

                        **Defendants.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**

### DECISION & ORDER

## I.    INTRODUCTION

      Plaintiff, a former inmate in the care and custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this action pursuant to 42 U.S.C. § 1983 alleging that Defendants, medical care professionals at Lakeview Shock Incarceration Correctional Facility ("Lakeview"), violated her Eighth Amendment rights by acting with deliberate indifference to her medical needs. _See generally_ ECF # 46.  Plaintiff alleges that defendants denied her adequate medical treatment on December 11, 2015 after she complained of vaginal hemorrhaging by failing to send her sooner to an outside hospital, resulting in Plaintiff suffering an injury and needing to be sent to Brooks Memorial Hospital ("Brooks") later that evening. _Id._

      Defendants move for summary judgment, arguing that the claims should be

1

dismissed because (1) Plaintiff's allegations amount to nothing more than a disagreement with her providers as to the appropriate course of treatment; (2) Plaintiff has not established each defendant's personal involvement; and (3) the defendants are entitled to qualified immunity.  ECF #68-1.  Plaintiff opposes the motion.  ECF # 73.

## II.    STANDARD OF REVIEW

On a motion for summary judgment the Court must construe the properly disputed facts in the light most favorable to the non-moving party, *see Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007), and may grant summary judgment only where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see O'Hara v. National Union Fire Ins. Co. of Pittsburgh, PA*, 642 F.3d 110, 116 (2d Cir. 2011).

## III.   BACKGROUND

Plaintiff arrived at Lakeview on July 15, 2015.  *See* Defs.' Statement Pursuant to Rule 7.1(a)(3), ECF #68-1, ¶ 1.[1]  Prior to arriving, Plaintiff had a pap smear performed with a final report dated July 9, 2015.  *Id.* ¶ 2.  The report indicated that Plaintiff's cervix showed precancerous markers that could develop into cervical cancer. *Id.*  3.  Nurse Practitioner Wilcox (NP Wilcox) reviewed the report on July 23, 2015 and met with Plaintiff on July 29, 2015 to discuss the condition and risks with her. *Id.* ¶ 4.   On July 23, 2015, NP Wilcox put in a request for Plaintiff  to have a colposcopy ("CLP") evaluation, and an appointment was scheduled for September 2, 2015 with an outside provider, Dr. Andre Persaud. *Id.* ¶ 5.

---

[1]Unless indicated otherwise, when the Court cites to the defendants' Statement Pursuant to Rule 7.1(a)(3), it does so in those instances where the Plaintiff has either admitted the stated fact or has failed to properly support the denial thereof.

Plaintiff underwent a CLP, and Dr. Persaud's report recommended that Plaintiff undergo a loop electrosurgical excision procedure ("LEEP") in order to remove the precancerous cells from Plaintiff's cervix. *Id.* ¶ 6.  NP Wilcox discussed Dr. Persaud's recommendation with Plaintiff and Plaintiff agreed to undergo a LEEP. *Id.* at 7.

Plaintiff successfully underwent the LEEP procedure at Brooks on November 23, 2015 and returned to Lakeview on November 24, 2015.  *Id.* ¶ 9.  Plaintiff's discharge instructions from Brooks indicated that she should have one day of rest, then return to usual activity as tolerated.  Wilcox Dec., Ex. K, ECF # 69, at p. 38.  Plaintiff notes that Lakeview "is a unique facility in that it consists of a daily regimen of strict, military-style discipline, unquestioning obedience to orders, and highly structured days filled with drills and hard work," and asserts that usual activity at a shock facility is significantly different than usual activity for an ordinary civilian. Pl. Resp. to Def. L.R. 7.1(a)(3) Stat., ECF # 73-1, ¶11 (citation omitted).  NP Wilcox noted in Plaintiff's Lakeview discharge summary that Plaintiff would need a follow-up appointment with her outside providers in two months to evaluate her cervix and the success of the LEEP procedure, Wilcox Decl. at ¶ 16, Ex. J, however, the Brooks discharge instructions indicate that Plaintiff should "call [her] Physician's office for a follow-up appointment to be seen *2 weeks - Dr. Persuad*."  ECF #69, p. 38.  "2 weeks" and "Dr. Persuad" are handwritten following the word "seen". *Id.*  It is not clear from this document whether Plaintiff is being directed to call her physician within two weeks to set up an appointment, or that an appointment should be scheduled within the two week period. The Brooks  discharge instructions also has a section entitled: "You Should Call Your Doctor  for Any of the Following:" *Id.*   In this section, the lines for "fever of 101° or higher,"

"pain that does not lessen with medication as prescribed by your doctor," "persistent nausea or vomiting into the next day," and "any problems" are indicated by checkmarks. *Id.* Below the "any problems" line is handwriting indicating "*heavy vaginal flow*." *Id.* In the "Special Instructions" section following the checked line for "no tub baths" is handwriting indicating "*douches, tampons, intercourse X 3 weeks*." *Id.*

On December 3, 2015, Plaintiff complained to Nurse Parker that for 3 or 4 days she was having a tan/brownish discharge from her vagina with sharp abdominal pains lasting a few seconds. *See* ECF #68-1, ¶ 12; Parker Decl., ECF # 69-1, ¶ 6 and Ex. A, p. 1. Nurse Parker performed an evaluation of Plaintiff and determined that the tan/brownish discharge and abdominal pains were consistent with clotting at the wound site following the LEEP procedure, and were anticipated symptoms following such a procedure. ECF #68-1, ¶ 13. Plaintiff describes her clotting as "huge" jelly-like blood coming from her vagina. *See* ECF # 68-2, Ex. A (Transcript of Ciandre Davis's June 26, 2018 Deposition), 32:20-24. Nurse Parker advised Plaintiff to follow up with the medical staff if her symptoms continued or intensified. ECF #68-1, ¶ 14.

On the morning of December 11, 2015, Plaintiff began experiencing heavier than normal bleeding that she attributed to the LEEP procedure. *See* ECF # 68-2, Ex. A, 34:2-16; 38:10-24. At approximately 9:00 a.m., Plaintiff went to a Lakeview class. *Id.* at 38:17-24. While in class, Plaintiff felt "a flush, a gush" and stood up. *Id.* at 39:3-4. As she stood up she saw that blood had soaked through her clothes and was "all over" her chair, with some on the floor. *Id.* at 39:4-6; 18-22. The classroom teacher called a drill instructor

4

to take Plaintiff to the medical unit.[2]  *Id.* at 39:6-7.

Plaintiff was uncertain as to the exact time she arrived at the medical unit, estimating that it was between 9:15 and 9:20 a.m.  *See id.* at 47:18-20.  However, Plaintiff's Ambulatory Health Record ("AHR"), *see* Parker Decl. Ex. B, which Plaintiff relies on in making arguments in this matter, *see* ECF # 73, pp. 15-16, and which Plaintiff's expert witness[3] relies on in offering opinions, *see* ECF #73-3, indicates that Plaintiff was brought to the medical unit for emergency sick call at 10:50 a.m. and was seen by Nurse Parker.  *See* Parker Decl., Ex. A.[4]  Plaintiff complained of heavy vaginal bleeding and clots, and stated that the blood had soaked through her pants.  ECF #68-1, ¶ 16.  She stated that the blood was dark maroon in color, and that she had not had a menstrual period in several months. *Id.*  Plaintiff asserts that there were "a lot of people" in the medical unit at the time and that Nurse Parker appeared to be upset that Plaintiff was there.  When asked at her deposition why she thought Nurse Parker was upset, Plaintiff stated: "Because she was huffing and puffing and said you know, I told you there was going to, you know, that there was the --- there's bleeding with this and [she] gave me [menstrual] pads and sent me on my way." ECF # 68-2, Ex. A, 43:2-11.

Plaintiff contends that Nurse Parker did not provide her with a medical  examination

---

[2]Plaintiff refers to the medical unit as the infirmary.  However, as explained by Nurse Colvin, in the prison system the infirmary is a separate ward in the medical unit in which inmates can be monitored more closely by the nursing staff and medical providers. Colvin Decl., ECF # 69-2, ¶ 10.  Plaintiff was admitted to the infirmary on December 11, 2015.  To avoid confusion, the Court will refer to the medical unit generally as the medical unit and the separate ward as the infirmary.

[3]Plaintiff provides an expert witness statement from Jane Grametbaur, RN, CCHP-RN, CCHP-A. *See* ECF #73-3.

[4]Plaintiff also does not contest the accuracy or authenticity of the medical records in this matter.

at this time. *Id.,* 43:20-25.  Nurse Parker asserts that she evaluated Plaintiff and

determined, based on Plaintiff's statements, that Plaintiff was not experiencing any

cramping, dizziness, or lightheadedness.  ECF #68-1, ¶ 17 (citing Parker Decl, ¶ 7).[5]  Nurse

Parker also contends that she did not see any blood on Plaintiff's clothing.  Parker Decl, ¶ 7.

Nurse Parker consulted with NP Wilcox and reported that Plaintiff was experiencing a small

amount of bleeding from her vagina which was maroon in color, that Plaintiff had informed

her that she had not had her period in several months, and that Plaintiff denied any

dizziness, cramping, or light-headedness.  Wilcox Decl., ECF # 69, ¶ 19.  NP Wilcox

concluded that Plaintiff's symptoms "were likely indicative of the return of her period, and/or

related to the clotting and healing of the wound site following the LEEP." *Id.*  NP Wilcox

directed that Plaintiff return to her regular activities but return to the medical unit if her

symptoms changed or intensified, or were otherwise inconsistent with the return of a period.

ECF #68-1, ¶ 19.  Nurse Parker provided Plaintiff with a pass so that she could freely use

the bathrooms at Lakeview to change her pads.  *See id.* ¶ 20.  Nurse Parker asserts that

she instructed Plaintiff to seek further medical attention if her symptoms continued or

intensified, particularly if the blood appeared bright red.  Parker Dec. at ¶ 7.  Plaintiff denies

that she was given this instruction but rather contends that Nurse Parker simply gave her

some menstrual pads, told her to change her pants, and to return to class.  ECF # 68-2, Ex.

A, 40:8-14; 47:21-48:14.  On this motion, the Court accepts Plaintiff's contention that she

was not told to return to the medical unit to seek additional medical attention if her

_____

[5]Plaintiff denies this allegation, asserting that she experienced lightheadedness throughout the day.
However her citation to the record indicates that she did not feel any lightheadedness until she was in the
infirmary where she was placed after she came to the medical unit for the second time. *See* ECF # 68-2, Ex.
A, 55:23-56:23.

symptoms continued or intensified, or if her blood appeared bright red.

After meeting with Nurse Parker, Plaintiff went back to her room where she changed her pants. *Id.*, 44:22-45:3; 106:15-23.  As she walked from her room to the classroom, Plaintiff saw that her pants were again stained with blood and that when she arrived at the classroom her bleeding was so heavy that she could not sit down. *See id.*, 45:5-22.  Plaintiff left her class and returned to the medical unit. *See id.*, 45:25-46:5; 106:15-23.

When Plaintiff returned to the medical unit she complained of continued vaginal bleeding, large clots, cramping and nausea.  ECF #68-1, ¶ 22.  Defendants contend that she also reported using a tampon. *Id.*, ¶ 23.  Plaintiff  asserts that when she returned to the medical unit she was seen again by Nurse Parker.  Plaintiff  was crying and requested to be taken to the hospital. ECF # 68-2, Ex. A, 49:4-8.  She asserts that Nurse Parker "was upset that [she] came back and they put [her] in a room and gave [her] some pads." *Id.,* 48:3-5. Plaintiff describes the room as the locked infirmary that contained two bedrooms and a bathroom. *Id.,* 48:3-25.  Plaintiff contends that Nurse Parker did not conduct any type of exam before placing her in the infirmary, *id.,* and told Plaintiff that she would not be taken to the hospital. *Id.* at 49:6-8.  Nurse Parker left the facility at 3:00 p.m. at the end of her shift. ECF #68-1, ¶ 21.

The records in this matter that Plaintiff and her expert witness rely on indicate that when Plaintiff returned to the medical unit, she was evaluated by Nurse Colvin. ECF # 68-1, ¶ 24 (citing Colvin Decl. at ¶ 7).  On this motion, the Court concludes that Plaintiff was first seen by Nurse Parker upon entering the medical unit the second time, and then was evaluated by Nurse Colvin.  Defendants assert that when Nurse Colvin conducted her

7

evaluation of Plaintiff, she observed only a small amount of blood on Plaintiff's pad, and no

blood on Plaintiff's clothing. ECF # 68-1, ¶ 24 (citing Colvin Decl. at ¶ 7). Plaintiff denies

this contention and, although the stated basis for the denial is insufficient,[6] the Court

accepts Plaintiff's testimony that at the time she was experiencing heavy bleeding that

soaked through her clothing and prohibited her from sitting down when she attempted to

return to the classroom. Nurse Colvin took Plaintiff's vital signs during the initial

consultation, which she concluded were within normal ranges. *Id.* ¶ 25 (citing Colvin Decl.

at ¶ 7).[7]

Defendants assert that Nurse Colvin "consulted with NP Wilcox, who concluded that

Plaintiff's symptoms could be the return of her period. However, he also noted that the

---

[6]Plaintiff denies this statement in Defendants's Local Rule 7.1(a)(3) Statement, but asserts only that "Plaintiff's statement that she had used approximately 30 pads while in the medical unit indicates that she bled more than 'a small amount.'" ECF # 73-1, ¶ 24 (citing Wilcox Decl., Exhibit N, (ECF Doc. No. 69, Page 58)). The document to which Plaintiff cites in support her denial, Wilcox Decl., Exhibit N, page 58, is part of the medical records from Brooks where Plaintiff was taken at 11:45 p.m. on December 11, 2015. The specific record that Plaintiff points to is a record taken at 4:13 a.m. on December 12, 2015 where Plaintiff stated to medical providers that "today around 4 AM (24 hours ago), she developed heavy vaginally bleeding, states approx. 30 pads over 24 hours." This statement is insufficient to deny that Nurse Colvin conducted an evaluation of Plaintiff, and it does not directly contradict Colvin's observation that she observed only a small amount of blood on Plaintiff's menstrual pad and no blood on her clothing when she first examined Plaintiff.

[7]Plaintiff denies this statement by stating:

Plaintiff experienced a significant blood pressure drop at defendant Colvin's 2100 check. Wilcox Declaration, Exhibit O, (ECF Doc. No. 69, ECF Page 140). Plaintiff's expert concluded that defendant Colvin's "lack of objective examination and documentation of [plaintiff's] condition directly resulted in the syncopal episode suffered by [plaintiff] at 2330. Szczepanski Decl. Ex. 1, Plaintiff's Expert Report at p. 5.

ECF # 73-1, ¶ 25. This statement's reference to Colvin's "2100 check" involves Colvin's actions after Plaintiff was admitted into the infirmary for observation, not the vital signs at 1:30 p.m. Further, Plaintiff's expert indicates that Nurse Colvin recorded Plaintiff's vital signs at 1:30 p.m. but does not indicate that they were abnormal. *See* ECF #73-3, at 3, 4-5. Still further, the quoted portion of Plaintiff's expert witness's statement appears in a paragraph in which the expert addresses Nurse Coleman's conduct relative to the 9:00 p.m. blood pressure reading. Moreover, the expert's opinion as to the cause of the syncopal episode suffered by Plaintiff at 11:30 p.m. does not provide a basis to conclude that Plaintiff's vital signs at 1:30 p.m. were abnormal.

bright red color of the blood could also indicate a disturbance of the wound site from the LEEP procedure, possibly from use of a tampon, which would need to clot and heal." *Id.* ¶ 26 (citing Colvin Decl. at ¶ 8; Wilcox Dec. at ¶ 20). Defendant denies that Nurse Colvin consulted with NP Wilcox because "Defendant Colvin's ambulatory health record progress notes from December 11, 2015 do not contain an entry stating that she consulted with defendant Wilcox." ECF # 73-1, ¶ 26. The failure to include an entry in Plaintiff's AHR does not, by itself, refute that NP Wilcox consulted with NP Wilcox. The Court finds that Plaintiff has failed to sufficiently oppose Defendant's contention that Nurse Colvin consulted with NP Wilcox after Nurse Colvin's evaluation of Plaintiff.

According to the defendants, "[i]n order to further evaluate Plaintiff's vaginal bleeding to determine its intensity and source, NP Wilcox ordered that Plaintiff be admitted to the infirmary as a precautionary measure, and that the nursing staff keep a pad count in order to track the amount of blood loss experienced by Plaintiff." ECF # 68-1, ¶ 27 (citing Colvin Dec. at ¶¶ 8, 9; Wilcox Dec. at ¶ 20). Plaintiff denies that NP Wilcox ordered Plaintiff admitted to the infirmary because "the contemporaneous notes taken by defendant Colvin do not state that defendant Wilcox order[ed] plaintiff to be admitted to the infirmary," and because "Plaintiff testified that she was admitted to the infirmary by defendant Parker." ECF # 73-1, ¶ 27. For reasons discussed above, the fact that Nurse Colvin's notes do not indicate that NP Wilcox ordered that Plaintiff be admitted to the infirmary does not refute the fact that he did so as he and Nurse Covin assert in their declarations. Further, Plaintiff's "Infirmary 24 Hour Admission & Observation Short Form" is signed by NP Wilcox. ECF # 69-2, p. 9. Moreover, the record citations that Plaintiff points to do not support the proposition that Nurse Parker admitted Plaintiff to the infirmary but only that when Plaintiff

9

returned to the infirmary Nurse Parker was upset and then "they put [Plaintiff]" in the infirmary. Even assuming that the "they" Plaintiff refers to is Nurse Parker, Plaintiff's testimony indicates only that she was physically placed in the infirmary by Nurse Parker. In addition, the reference to "they" indicates that the decision to place Plaintiff in the infirmary was made by more than one individual. Plaintiff has not sufficiently refuted the fact that it was NP Wilcox who ordered Plaintiff placed in the infirmary. According to Defendants, after directing that Plaintiff be admitted to the infirmary, NP Wilcox had no further interaction with Plaintiff on December 11, 2015, and left the facility at approximately 2:10 p.m. *See* ECF # 68-1, ¶ 28. Plaintiff denies that NP Wilcox admitted Plaintiff to the infirmary, but admits that he did not interact with Plaintiff and left the facility at 2:10 on December 11, 2015. ECF # 73-1, ¶ 28.

There is a dispute as to the time that Plaintiff returned to the medical unit. Plaintiff testified that she left the medical unit at 10:00 a.m. after initially meeting with Nurse Parker, and that it took approximately 15 to 20 minutes to change her pants, walk back to her classroom, and then return to the medical unit. *Id.* at 46:3-47:20. However, Nurse Colvin, and her notations on Plaintiff's AHR, indicate that Plaintiff returned to the medical unit at 1:30 p.m. complaining of continued vaginal bleeding, large clots, cramping and nausea, and stating that she was using a tampon. Colvin Dec., ECF # 69-2, ¶¶ 6, 12 fn. 1, and Ex. A. Furthermore, the "Infirmary 24 Hour Admission & Observation Short Form" attached as exhibit B to Nurse Colvin's Declaration indicates that Plaintiff was admitted at 1:50 p.m. Again, Plaintiff relies on Nurse Colvin's records in making arguments in this matter, *see* ECF # 73, pp. 16-17, and her expert witness also relies on these records in offering opinions. *See* ECF #73-3. "When opposing parties tell two different stories, one of which is

blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (finding that summary judgment was appropriate where police video contradicted plaintiff's account of high-speed chase); *McKinney v. Dzurenda*, 555 F. App'x 110, 111-12 (2d Cir. 2014) (holding that the district court properly disregarded plaintiff prisoner's account of events where video clearly showed correction officers using force only after plaintiff  "assumed a boxing stance and made clear his willingness to fight").  Plaintiff's statement that she arrived back at the medical unit earlier than 1:30 p.m. appears to be blatantly contradicted by the record such that the Court need not credit it.  Nevertheless, for purposes of this motion the Court accepts that the time that Plaintiff arrived back at the medical unit was earlier than 1:30 p.m..

Pursuant to established DOCCS procedures, inmates admitted to the infirmary are evaluated by the nursing staff at a minimum every eight hours, which includes taking the inmate's vital signs and recording the evaluations in an infirmary admission form. ECF # 68-1, ¶ 29.  On December 11, 2015, Nurse Colvin was the nurse assigned to the infirmary for the 3:00 p.m. to 11:00 p.m. shift. *Id.* ¶ 30.  Although DOCCS procedures required evaluations only every eight hours, after Plaintiff was admitted to the infirmary Nurse Colvin performed evaluations of Plaintiff at 5:00 p.m. and 9:00 p.m.  *Id.* ¶ 31.  On each occasion, she took and recorded Plaintiff's vital signs, and inquired as to Plaintiff's symptoms.  *Id.* ¶ 32.  Plaintiff's blood pressure reading at 5:00 p.m. was 110/67, and at 9:00 p.m. was 98/70.  Colvin Decl., Ex. B, p. 1.  Nurse Colvin asserts that "[w]hile [Plaintiff's] blood pressure did show a drop [at 9:00 p.m.], Plaintiff had been sleeping just prior to my evaluation of her.

Blood pressure is lower when a person has been sleeping, or has just woken up, which I judged to be the reason Plaintiffs blood pressure was lower during this evaluation." Colvin Decl. ¶ 14.   Also with respect to 9:00 p.m. evaluation, Nurse Colvin asserts that Plaintiff informed her that she was experiencing no pain but continued to have large clots, and indicated that she had used six pads since her admission to the infirmary.  Colvin Decl. ¶ 14; *see* Colvin Decl., Ex. B, p. 2.   Plaintiff correctly notes that Nurse Colvin's records do not contain an explicit menstrual pad count.  Nurse Colvin asserts that she concluded on both evaluations that Plaintiff's vital signs were within normal ranges, her pad usage was not significant, and, accordingly, that Plaintiff did not need immediate medical attention from a provider.  ECF # 68-1, ¶ 33.  Nurse Colvin asserts that she concluded that the appropriate course of treatment was to continue to evaluate Plaintiff in the infirmary as directed by NP Wilcox. *Id.* ¶ 34.  Plaintiff admits that these were Nurse Colvin's personal conclusions, but denies that her conclusion that Plaintiff did not need immediate medical attention from a provider was correct.  ECF #73-1, ¶ 34.  Nurse Colvin had no further interaction with Plaintiff after her 9:00 p.m. evaluation and left the facility at the end of her shift at 11:00 p.m. ECF # 68-1, ¶ 35.

Plaintiff asserts that she continued to experience heavy bleeding while she was locked in the infirmary and was "getting weak," ECF # 68-2, Ex. A, 51:20-22, but did not report her worsening health condition to the nurses because she was fearful of retaliation. *Id.* 57:17- 58:11.  At approximately 11:30 p.m., Plaintiff experienced a syncopal episode while in the infirmary.  ECF # 68-1, ¶ 36.  Plaintiff asserts that she passed out in the infirmary's bathroom and fell striking her face causing her tooth to bite through her lower lip and suffering a laceration on her chin.  ECF # 68-2, Ex. A, 53:7-13; 55:15-56:6; 58:12-20.

12

Plaintiff stood up and banged on the door to get the attention of the nursing staff before passing out again. *Id.* at 52:5-8; 52:23-25; 54:19-55:5; 59:4-6.

Plaintiff briefly regained consciousness in the infirmary as Lakeview staff members were taking pictures of her and the room. *Id.* at 59:15-22; 59:24-60:3. Plaintiff recalled a female nurse being startled by her condition. *Id.* at 60:5-8; ECF # 68-2, Ex. B (Transcript of Ciandre Davis's May 28, 2019 Deposition), 51:5-23; 53:9-54:15. After approximately 20 seconds of consciousness, Plaintiff passed out again. ECF # 68-2, Ex. A, 59:10- 13. When Plaintiff regained consciousness, she was at Brooks. *Id.* at 60:20-25.

The record in this case indicates that at 11:30 p.m., Plaintiff had a blood pressure reading of 83/56. Wilcox Decl., Ex. O, p. 140. Because Plaintiff testified that before she passed out she was unable to summon a nurse by using the emergency call bell, *see* ECF # 68-2, Ex. A, 56:24-57:16, the reasonable inference is that the 11:30 p.m. blood pressure reading was taken after Plaintiff fainted. This interpretation is supported by the 11:30 p.m. entry on Plaintiff's Infirmary 24 Hour Admission & Observation Short Form that starts with the notation: "I/M banging on the door. Stated she had passed out in BR." Colvin Decl., Ex. B. The notation then goes on to describe the injuries Plaintiff sustained when she passed out, and then references the blood pressure reading of 83/56. *Id.* Further, there is no dispute that this blood pressure reading was taken after the remaining defendants had left the facility.

The nurse responsible for the inmates in the infirmary for the 11:00 p.m. to 7:00 a.m. shift contacted the on-call physician, Dr. Caisley, who directed her to attempt to contact Erie County Medical Center for Tele-med, and if unable to do so, to send Plaintiff to Brooks.

13

ECF # 68-1, ¶ 37.  The nursing staff was unable to obtain Tele-med services, and sent Plaintiff to Brooks at approximately 11:45 p.m. *Id.* ¶ 38.  At Brooks, Plaintiff's lip was sutured, her cervix was cauterized in order to prevent any additional bleeding, and she received a transfusion of two units of blood. *Id.* ¶¶ 39-40.

Plaintiff returned to Lakeview on December 14, 2015 and remained in the facility infirmary so that the staff could monitor her condition and ensure her recovery. *Id.* ¶ 41. Plaintiff showed no signs of complications, and was discharged from the infirmary the same day. *Id.* ¶ 42.  NP Wilcox saw Plaintiff on December 16 and 18, 2015 for follow-up appointments and Plaintiff did not report any complications with her recovery. *Id.*

However, when Plaintiff returned to Lakeview, she had trouble sleeping and experienced depression and anxiety because she feared the Lakeview staff would retaliate against her and prolong her imprisonment. ECF # 68-2, Ex. A, at 97:11-99:9.  Plaintiff was released from Lakeview in February 2016 and continues to suffer from the sleeping problems, as well as the psychological and emotional injuries she experienced at Lakeview. *Id.* at 98:2-100:16; 104:5-106:5.  Additionally, Plaintiff's injuries have had an economic impact, as they have made working in her trained field, nursing, difficult. *Id.* at 105:4-16.

## IV.   DISCUSSION

### a.  Withdrawn Claims

Plaintiff indicates that she "voluntarily withdraws her claim that defendant Wilcox was deliberately indifferent for 'insisting' that she undergo a LEEP procedure and for her immediate post-LEEP procedure treatment," and "voluntarily dismisses her claim against defendant Hayden." Dkt. No. 73 at pp. 8 fn.2, 14 fn. 4.  Inasmuch as Defendants sought to

dismiss these claims in their motion, Plaintiff's withdrawal of these claims tacitly acknowledges that the claims are without merit.  Accordingly, those portions of Defendants' motion to dismiss these claims are granted, and these claims are dismissed with prejudice.

### b.  Eighth Amendment Medical Indifference

#### 1.  Eighth Amendment Standard

Generally, the Eighth Amendment provides that prison officials have a duty to supply inmates with medical care.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).   However, "[t]his does not mean . . . that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment."  *Estelle v. Gamble*, 429 U.S. 97, 105 (1976).   "An Eighth Amendment claim arising out of inadequate medical care requires a demonstration of 'deliberate indifference to [a prisoner's] serious medical needs.'" *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir. 2011) (quoting  *Estelle*, 429 U.S. at 104).   The deliberate indifference standard has both objective and subjective components. *Id.*

"The objective component requires that 'the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists.'" *Id.* (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.1996) (internal quotation marks omitted).   "[A] serious medical need exists where the failure to treat a prisoner's condition could result in further significant injury or unnecessary and wanton infliction of pain." *Smith v. Carpenter*, 316 F. 3d 178, 187 (2d Cir. 2003) (citing *Harrison v. Barkley*, 219 F. 3d 132 (2d Cir.1998)); *see Shabazz v. Howard*, No. 9:12-CV-1372 NAM/TWD, 2015 WL 5604662, at *4 (N.D.N.Y. Sept. 23, 2015)("The Second Circuit has stated that a medical need is serious if it presents 'a condition of urgency that

15

may result in degeneration or extreme pain.'")(quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.1998)). "[D]eprivations of medical care that cause or perpetuate pain are sufficient to state an Eighth Amendment claim." *Brock v. Wright*, 315 F.3d 158, 163 (2d Cir. 2003).

"Courts distinguish between situations where no medical attention is given and situations where medical attention is given, but is objectively inadequate." *Bethel v. Wolff*, No. 14-CV-6519 (KMK), 2017 U.S. Dist. LEXIS 19348, at *26 (S.D.N.Y. Feb. 10, 2017). "In the former, the Court need only 'examine whether the inmate's medical condition is sufficiently serious.'" *Id.* (quoting *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006)). "In the latter, however, the inquiry is 'narrower'; for example, 'if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.'" *Id.* (quoting *Salahuddin*, 467 F.3d at 280, in turn quoting *Smith*, 316 F.3d at 185). In delay cases, "the relevant time period begins when a defendant becomes aware of facts from which he could, and does, infer that a substantial risk of serious harm exists." *Morrison v. New York City Dep't of Corr.*, No. 11 CIV. 9109 DAB, 2013 WL 5308015, at *4–5 (S.D.N.Y. Sept. 20, 2013) (citing *Farmer*, 511 U.S. at 837; *Lloyd v. Lee*, 570 F. Supp.2d 556, 569 (S.D.N.Y.2008) (finding start of delay period to be plaintiff's first request for an MRI)).

> Subjectively, the official charged with deliberate indifference must act with a "sufficiently culpable state of mind." *See Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L.Ed.2d 271 (1991). That is, the official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

16

> *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed.2d 811
> (1994).

*Hill*, 657 F.3d at 122.

The subjective component requires a plaintiff to demonstrate "that the defendant

acted with the requisite culpable mental state similar to that of criminal recklessness."

*Shabazz*, 2015 WL 5604662, at *4 (citing *Wilson v. Seiter*, 501 U.S. 294, 301–03 (1991);

*Hathaway*, 37 F.3d at 66); *see also Lawrence v. Evans*, 669 F. App'x 27, 28 (2d Cir. 2016)

("To satisfy the subjective component [of an Eighth Amendment medical-treatment claim], a

plaintiff must establish the equivalent of criminal recklessness, *i.e.*, 'that the charged official

act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm

will result.'") (quoting *Salahuddin*, 467 F.3d at 280). In this regard, "[a] plaintiff must

demonstrate that a defendant acted with reckless disregard to a known risk of substantial

harm." *Shabazz*, 2015 WL 5604662, at *4 (citing *Farmer*, 511 U.S. at 836). "Thus, to

establish deliberate indifference, an inmate must prove that (1) the defendant was aware of

facts from which the inference could be drawn that the inmate had a serious medical need;

and (2) the defendant actually drew that inference.*" Id.* (citing *Farmer*, 511 U.S. at 837;

*Chance*, 143 F.3d at 702). "The inmate then must establish that the [defendant]

consciously and intentionally disregarded or ignored that serious medical need." *Id.* (citing

*Farmer*, 511 U.S. at 835).

"'[D]eliberate indifference is more substantial than mere disagreement over a course

of treatment, negligence or even medical malpractice.'" *Id.* (quoting *Santana v. Watson*, No.

13 Civ. 1549(SAS), 2014 WL 1803308, at * 5, 2014 U.S. Dist. LEXIS 62628, at * 24

(S.D.N.Y. May 6, 2014)). "Medical malpractice does not rise to the level of a constitutional

violation unless the malpractice involves culpable recklessness—'an act or a failure to act by [a] prison doctor that evinces a conscious disregard of a substantial risk of serious harm.'" *Hill*, 657 F.3d at 123 (quoting *Chance*, 143 F.3d at 703) (internal quotation marks omitted).  "In this connection, the Supreme Court has held that 'a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.'" *Id* (quoting *Estelle*, 429 U.S. at 106).

"It has long been the rule that a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment."  *Hill*, 657 F.3d at 123 (citing *Estelle*, 429 U.S. at 106–07); *see Chance*, 143 F.3d at 703.[8]  "Accordingly, . . . the 'essential test is one of medical necessity and not one simply of desirability.'" *Hill*, 657 F.3d at 123 (quoting *Dean,* 804 F.2d at 215) (internal quotation marks omitted); *see Wright v. Genovese*, 694 F. Supp. 2d 137, 155 (N.D.N.Y. 2010)("Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment.").

### 2.  Personal Involvement

Plaintiff must also establish that each defendant was involved in the alleged constitutional violation to recover damages from him or her.  *Ashcroft v. Iqbal*, 556 U.S. 662,

---

[8]In *Chance*, the Second Circuit has stated:

It is well-established that mere disagreement over the proper treatment does not create a constitutional claim.  So long as the  treatment given is adequate, that fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation. Moreover, negligence, even if it constitutes medical  malpractice, does not, without more, engender a constitutional claim

143 F.3d at 703 (citing *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986) and *Estelle*, 429 U.S. at 106).

677 (2009); *see Excell v. Woods*, No. 07-CV-0305, 2009 WL 3124424, at *20 (N.D.N.Y. Sept. 29, 2009); *Singletary v. Russo*, 377 F. Supp. 3d 175, 185 (E.D.N.Y. 2019).  In order to state a cause of action under Section 1983 against an individual defendant, a Plaintiff must plausibly allege some tangible connection between the alleged unlawful conduct and that defendant. *See Excell,* 2009 WL 3124424, at *20.

### c. Analysis

The Court will examine each defendant's conduct to determine whether that defendant was personally involved in an Eighth Amendment violation.

#### 1. Nurse Parker

##### A. Initial Encounter on December 11

When Nurse Parker first encountered Plaintiff on December 11 at the medical unit, she was aware that Plaintiff had undergone a LEEP procedure, that Plaintiff had complained on December 3, 2015 about vaginal discharge and bleeding occurring over four days, that Nurse Parker had determined that these were symptoms consistent with someone who had undergone a LEEP procedure, and that Nurse Parker had instructed Plaintiff to seek additional medical attention if her symptoms continued or intensified.  On December 11, Plaintiff told Nurse Parker that she was having heavy vaginal bleeding and clots and that the blood had soaked through her pants.  A reasonable fact finder could conclude that Plaintiff's symptoms from her LEEP procedure had intensified and that she was seeking additional medical attention as Nurse Parker instructed her to do on December 3.  As Plaintiff's expert indicates, excess bleeding can be a complication of a LEEP procedure and requires careful monitoring to determine whether the person has acute

19

vaginal hemorrhaging. *See* ECF # 73-3, p. 7.  Under the circumstances, a reasonable fact finder could also conclude that at the time Nurse Parker was aware of facts from which the inference could be drawn that Plaintiff had a serious medical need requiring medical attention beyond simply providing Plaintiff with menstrual pads, that Nurse Parker actually drew that inference, and that Nurse Parker consciously and intentionally disregarded or ignored that serious medical need and thereby delayed Plaintiff's receipt of necessary medical attention to rule out that Plaintiff was vaginally hemorrhaging.   Although defendants assert that Nurse Parker contacted NP Wilcox for advice, Nurse Parker did not conduct a medical examination of Plaintiff and reported to NP Wilcox that Plaintiff was experiencing only a small amount of vaginal bleeding.  Accepting Plaintiff's contention that immediately before arriving at the medical unit she had bled so much that it soaked through her pants, covered her chair, and ran onto the floor, a reasonable fact finder could conclude that Nurse Parker's report to NP Wilcox was inaccurate in that it minimized Plaintiff's bleeding.  Further, accepting Plaintiff's contention that Nurse Parker appeared upset when Plaintiff came to the medical unit on December 11, a reasonable fact finder could conclude that Nurse Parker recklessly jumped to the conclusion that Plaintiff was merely experiencing additional normal symptoms from her LEEP procedure or that her menstrual cycle had returned, not that she was suffering a serious medical issue, and intentionally minimized the evidence that she reported to NP Wilcox. *See, e.g., Chance*, 143 F.3d at 703 ("[A] physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan.").  While a jury might conclude that Plaintiff's claim against Nurse Parker for this first encounter amounts to nothing more than a disagreement over a course of treatment or a claim of medical malpractice, the Court finds that Plaintiff has

asserted sufficient disputed facts to survive a motion for summary judgment on her Eighth Amendment claim against Nurse Parker.

### B.  Second Encounter on December 11

To the extent that Plaintiff brings an Eighth Amendment claim against Nurse Parker for conduct occurring the second time that Plaintiff went to the medical unit on December 11, the claim must be dismissed.  Plaintiff asserts that "[i]nstead of contacting the doctor who performed plaintiff's surgery, as instructed in her discharge papers, defendants ignored plaintiff's cries for help and locked her in a room, alone, where she continued to experience heavy vaginal bleeding." ECF # 73, pp. 7-8.  While Plaintiff asserts that it was Nurse Parker who ignored her plea to be brought to the hospital and instead gave her menstrual pads and placed her in the locked infirmary, Plaintiff presents insufficient evidence to establish that Nurse Parker was aware of the instruction on Plaintiff's discharge form that the doctor should be called if Plaintiff had heavy vaginal flow.  Furthermore, the facts indicate that once admitted to the infirmary Plaintiff was monitored by Nurse Colvin.  Whether or not Nurse Colvin's monitoring was constitutionally adequate, Plaintiff has not presented facts from which a reasonable fact finder could conclude that Nurse Parker unconstitutionally delayed Plaintiff's need for additional medical attention to determine whether Plaintiff was vaginally hemorrhaging.  Indeed, as discussed next, while Plaintiff was in the infirmary Nurse Colvin was tasked with monitoring, *inter alia*, Plaintiff's vaginal bleeding.  Plaintiff's facts establish neither that Nurse Parker delayed Plaintiff from receiving seemingly adequate medical attention in the infirmary, nor that Nurse Parker acted with a sufficiently culpable state of mind when she placed Plaintiff in the infirmary.  Thus, to the extent that

Plaintiff asserts an Eighth Amended claim against Nurse Parker for her conduct when Plaintiff returned to the medical unit on December 11, the claim is dismissed.

### 2. Nurse Colvin

The Eighth Amendment claim against Nurse Colvin is very close to being a disagreement with her providers as to the proper care or a medical malpractice claim. However, for reasons explained below the Court finds that Plaintiff's evidence, viewed in the light most favorable to her, is sufficient for a reasonable fact finder to conclude that Nurse Colvin violated Plaintiff's Eighth Amendment rights.

Immediately before Plaintiff returned to the medical unit on December 11, she asserts that she continued bleeding so heavily that it again soaked through her pants. While Nurse Colvin reported to NP Wilcox that she had observed only a small amount of bright red blood on Plaintiff's pad, NP Wilcox told Nurse Colvin that the source of the blood might indicate a disturbance at the wound site of the LEEP procedure and ordered that Plaintiff be admitted to the infirmary so the nursing staff could monitor Plaintiff for this condition and assist in evaluating and determining the cause of Plaintiff's bleeding. NP Wilcox also instructed that the nursing staff perform "a pad count." As Nurse Colvin indicates in her declaration, a pad count is used to track blood loss by recording how frequently a patient uses pads to absorb blood. Given these facts, a reasonable fact finder could conclude that Nurse Colvin was aware that Plaintiff had a serious medical need for proper monitoring of her menstrual pad usage to determine the amount she was vaginally bleeding. *See* Colvin Decl., ECF #69-2, ¶ 14 (Once in the infirmary, "had Plaintiff reported, or I observed, any bleeding, pad usage, or other symptoms that were significant or a cause

of concern, I would have taken appropriate action to have Plaintiff immediately evaluated by an on-call physician.").  However, the facts in this case, viewed in the light most favorable to Plaintiff, indicate that Plaintiff first presented to Nurse Colvin with an indication that she was experiencing significant vaginal bleeding, and once admitted to the infirmary Nurse Colvin only asked Plaintiff what her menstrual pad usage was when Nurse Colvin evaluated Plaintiff at 9:00 p.m.  There is no indication that Nurse Colvin kept a specific pad count. While Plaintiff's 9:00 p.m. report might have been an under-representation of her pad usage, perhaps because Plaintiff was fearful of retaliation from the nursing staff if she made too much of a fuss while in the infirmary, *see* ECF # 68-2, Ex. A, 54:14-18,  Nurse Colvin nonetheless was instructed by NP Wilcox to keep a pad count to monitor Plaintiff's actual blood loss.  A reasonable fact finder might conclude that Nurse Colvin's inquiry of Plaintiff about her pad usage was sufficient under the circumstances.  But this fact finder might also conclude that Nurse Colvin consciously and intentionally disregarded or ignored Plaintiff's serious medical need for close monitoring of her blood loss and thereby caused an unreasonable delay in Plaintiff being transferred to an outside provider capable of investigating the LEEP wound site.

Similarly, although Plaintiff had her syncopal episode after Nurse Coleman's shift ended, there exists a material question of fact whether Nurse Colvin was deliberately indifferent to Plaintiff's progressively worsening condition.  Based on Plaintiff's expert witness's opinion that Plaintiff's exceptionally low 11:30 p.m. blood pressure reading and the eventual need for a transfusion of two units of blood were likely caused by acute vaginal hemorrhaging while Plaintiff was in the infirmary, and that proper monitoring by Nurse Colvin would have made this hemorrhaging evident, *see* ECF # 73-3, pp. 4-5, 7, a

23

reasonable fact finder could conclude that Nurse Colvin's failure to more closely monitor

Plaintiff's condition is evidence of deliberate indifference to Plaintiff's serious medical need.

Under the circumstances, a reasonable fact finder could conclude that at the time Nurse

Colvin was aware of facts from which the inference could be drawn that Plaintiff had a

serious medical need requiring close medical monitoring, that Nurse Colvin actually drew

that inference, and that Nurse Colvin consciously and intentionally disregarded or ignored

that serious medical need and thereby delayed Plaintiff's receipt of necessary medical

attention to address the cause of Plaintiff's vaginal hemorrhaging.

Accordingly, that portion of the defendants' motion to dismiss the Eighth Amendment

claim against Nurse Colvin is denied.

### 3. NP Wilcox

The Eighth Amendment Claim against NP Wilcox must be dismissed.  On December

11, he received two reports from nurses in the medical unit that Plaintiff was complaining of

vaginal blood loss.  On the first report from Nurse Parker, NP Wilcox was advised that

Plaintiff was experiencing a small amount of bleeding from her vagina that was maroon in

color.  Nurse Parker also reported that Plaintiff had informed her that Plaintiff had not had

her period for several months, and that she denied any dizziness, cramping or

lightheadedness.  NP Wilcox concluded that the Plaintiff's symptoms were likely indicative

the return of her period and/or related to the clotting and healing of the wound site following

the LEEP.  Based on information provided to him, a reasonable fact finder could not

conclude that NP Wilcox recklessly ignored a serious medical need by instructing Nurse

Parker to provide Plaintiff with menstrual pads and instructing Plaintiff to monitor her

bleeding and return to the medical unit if her symptoms changed or intensified, or were

otherwise inconsistent with the return of her period.

On the second report from Nurse Colvin, NP Wilcox was advised that Nurse Colvin had observed a small amount of bright red blood on Plaintiff's pad.  NP Wilcox concluded that Plaintiff's symptoms might be the return of her period, but he was also concerned that the presence of bright red blood might indicate that it was coming from a disturbance at Plaintiff's LEEP wound site.  He therefore ordered that Plaintiff be placed in the infirmary for 24 hours, and that the nursing staff evaluate Plaintiff and keep a pad count in order to determine how much, and how often, Plaintiff was experiencing vaginal bleeding.  While the unfortunate hindsight gained from circumstances following Plaintiff's syncopal episode indicates that this might not have been the proper medical course, NP Wilcox's decision to have Plaintiff monitored in the infirmary does not establish that he was deliberately indifferent to Plaintiff's medical need as he understood that need to be at the time. *See Melvin v. Cty. of Westchester*, No. 14-CV-2995 (KMK), 2016 WL 1254394, at *7 (S.D.N.Y. Mar. 29, 2016)("Notwithstanding the tragic loss of life that ultimately resulted, it bears noting that the benefit of hindsight cannot support a claim of deliberate indifference to a serious medical need that was unknown at the time of treatment.")(citing *Figueroa v. Semple*, No. 12-CV-982, 2015 WL 3444319, at *5 (D. Conn. May 28, 2015) ("Although the injuries suffered by the plaintiff provide the [c]ourt with the benefit of hindsight, they do not show that, at the time of the incident in question, the defendants disregarded an excessive risk to the plaintiff's safety."); *Wise v. Ranck*, No. 07-CV-1899, 2008 WL 4861974, at *3 (M.D. Pa. Nov. 6, 2008) ("[D]eliberate indifference must be viewed from the prison official's perspective at the time in question, not with hindsight's perfect vision."), *reconsideration*

*denied*, 2009 WL 1458106 (May 26, 2009)).  Under these circumstances, a reasonable fact finder could not conclude that NP Wilcox recklessly ignored a serious medical need or that his direction to place Plaintiff in the infirmary for monitoring was an unreasonable delay in transferring Plaintiff to an outside provider.

For these reasons, the Eighth Amendment claim against NP Wilcox is dismissed.

### d. Qualified Immunity

Defendants assert that they are entitled to qualified immunity.  "Officials are sheltered from suit, under a doctrine known as qualified immunity, when their conduct does not violate clearly established . . . constitutional rights' a reasonable official, similarly situated, would have comprehended." *Wood v. Moss*, 134 S. Ct. 2056, 2061 (2014)(internal quotation marks and citation omitted).  "The issues on qualified immunity are: (1) whether plaintiff has shown facts making out a violation of a constitutional right; (2) if so, whether that right was 'clearly established'; and (3) even if the right was 'clearly established,' whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013).  "Defendants bear the burden of establishing qualified immunity." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015).

Defendants argue that "because defendants consistently provided plaintiff medical care and treatment the entire time she was at Lake view, defendants have not violated any of plaintiff's constitutional rights . . . " ECF # 68-4, p. 19.  This argument is without merit.  Plaintiff's allegations, accepted as true for purposes of this motion, establish that Nurses Parker and Colvin were each deliberately indifferent to Plaintiff's serious medical need arising from Plaintiff excessive bleeding potentially the result of complications arising from

26

Plaintiff's LEEP procedure.

Defendants' argument in support of qualified immunity does not specifically contend that Plaintiff did not have a clearly established right to receive adequate and timely medical attention to her serious medical need presented by her excessive vaginal bleeding. *See* ECF # 68-4, at 19.   Even if this was argument was made, it would not succeed under Plaintiff's version of the facts.   While the Court is unable to find a case from the United States Supreme Court or the Second Circuit Court of Appeals directly on point involving excessive vaginal bleeding following a LEEP procedure, there are numerous cases decided before the event in question here that found that deliberate indifference to a serious medical need arises to the level of an Eighth Amendment violation when prisons officials decline to provide, or delay, medical treatment for a condition that could cause significant harm to an inmate. *See Chance*, 143 F. 3d at 702, 703 (prisoner's unresolved dental condition, which caused him great pain, difficulty in eating, and deterioration of the health of his other teeth, was held to be sufficiently serious to meet the *Estelle* standard); *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996)(inmate's need for prescription eyeglasses constituted a serious medical condition where, as result of not having glasses, the inmate suffered headaches, his vision deteriorated, and he was impaired in daily activities); *Hathaway v. Coughlin*, 37 F.3d 63, 67 (2d Cir.1994)(identifying as serious a hip condition that caused a prisoner "great pain over an extended period of time and ... difficulty walking"); *Archer v. Dutcher*, 733 F.2d 14, 16 (2d Cir. 1984) (pregnant inmate's allegations of delay in medical care approved by her doctor were sufficient to raise triable issue of fact as to deliberate indifference claim); *see also Chance*, 143 F.3d at 702 ("A prisoner who nicks himself shaving obviously does

27


not have a constitutional right to cosmetic surgery. But if prison officials deliberately ignore the fact that a prisoner has a five-inch gash on his cheek that is becoming infected, the failure to provide appropriate treatment might well violate the Eighth Amendment.").  These cases support the conclusion that Plaintiff's excessive vaginal bleeding presented a serious medical need under the Eighth Amendment that was clearly established at the time of the challenged conduct.  Furthermore, there is a robust consensus of cases of persuasive authority showing that an inmate's excessive vaginal bleeding, or like circumstances, arise to the level of a serious medical need under the Eighth Amendment. *See Overstreet v. Virts*, No. 14-CV-6582P, 2019 WL 1331567, at *16 (W.D.N.Y. Mar. 25, 2019) (citing*Townsend v. Jefferson Cty.*, 601 F.3d 1152, 1158 (11th Cir. 2010) (incarcerated pregnant plaintiff experiencing abdominal pain and vaginal bleeding "presented evidence that she had a serious medical need"); *Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007) (amniotic fluid leak was a serious medical need); *Pool v. Sebastian Cty.*, 418 F.3d 934, 944-45 (8th Cir. 2005) (plaintiff "informed prison officials that she was pregnant, bleeding and passing blood clots ... [and] that [she] was in extreme pain from the cramping[;] ... [t]hese facts ... constituted a need for medical attention that would have been obvious to a layperson") (internal quotation omitted); *Cooper v. Rogers*, 968 F. Supp. 2d 1121, 1131 (M.D. Ala. 2013) ("[p]rolonged vaginal bleeding, particularly when accompanied by pain, is a serious medical condition that is indeed so obvious that even a lay person would easily recognize[ ] the necessity for a doctor's attention") (internal quotations omitted); *Cooper v. Rogers*, 2012 WL 2050577, *4 (M.D. Ala. 2012) ("the law is unwaveringly clear that prolonged vaginal bleeding during pregnancy does constitute a

serious medical need") (collecting cases); *Ferris v. Cty. of Kennebec*, 44 F. Supp. 2d 62, 67 (D. Me. 1999) (plaintiff's allegations that she informed prison officials that she was experiencing vaginal bleeding and believed she was miscarrying "was plainly serious")).

As to the objective reasonableness prong, Defendants argue that "reasonable officials, similarly situated to Defendants, would not have comprehended that they were violating any of Plaintiff's rights because of their consistently reasonable assessment and monitoring of Plaintiff." ECF #68-4, p. 19.   Given the disputed factual questions underlying Plaintiff's Eighth Amendment claims against Nurses Parker and Colvin, the Court is unable to determine at this time whether either defendant's actions or omissions were objectively reasonable.  If the facts are developed as Plaintiff claims, that is that Nurses Parker and Colvin recklessly disregarded Plaintiff's excessive vaginal bleeding despite knowing that Plaintiff had undergone a LEEP procedure, then it would not be objectively reasonable for similarly situated medical officials to disregard Plaintiff's serious medical need for additional medical intervention.   Accordingly, qualified immunity to Nurses Parker and Colvin is denied at this time.

**V.    CONCLUSION**

For the reasons discussed above, the defendants' motion for summary judgment, ECF # 68, is **GRANTED in part and DENIED in part**.  The motion is granted in that all claims against Nurse Practitioner Wilcox and Nurse Hayden are **DISMISSED**.  The motion is denied as to claims against Nurse Parker and Nurse Colvin.

The Clerk of the Court may terminate Nurse Practitioner Wilcox and Nurse Hayden from the docket.

**IT IS SO ORDERED.**

Dated: October 1, 2020

Thomas J. McAvoy
Senior, U.S. District Judge